## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

SUSAN HERING, on her own behalf and ）
as the representative of her beneficiary daughter, ）   Case No. _____
and on behalf of all others similarly situated, ）
                                ）
        Plaintiff, ）
                                ）   **CLASS ACTION COMPLAINT**
   v. ）
                                ）
NEW DIRECTIONS BEHAVIORAL HEALTH, ）
L.L.C., and BLUE CROSS BLUE SHIELD OF ）
FLORIDA, INC., ）
                                ）
        Defendants ）

## INTRODUCTION

1.    Defendant Blue Cross Blue Shield of Florida ("BCBSF"), a Florida Corporation with its principal place of business in Jacksonville, Florida, contracts with employers to provide group health insurance to employees and their qualified family members ("beneficiaries"). These contracts, known as "group plans" or "plans," enumerate the health care benefits BCBSF will cover for those employees and their beneficiaries. These BCBSF plans require that covered services be medically necessary, which is defined as those services that are consistent with generally accepted standards of medical practice.

2.    The BCBSF plan that insures Plaintiff Susan Hering ("Hering") and her family was obtained through her private employer and is governed by the statutory terms and related regulations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104(a), which define BCBSF as the fiduciary for plan members and their beneficiaries. This statutorily imposed fiduciary duty, in turn, requires BCBSF to administer the plan "solely in the interests of the participants and their beneficiaries" and to make benefit decisions consistent with the plan terms, including by covering services that are medically necessary and, thus, consistent with generally accepted standards of medical practice.

3.    The BCBSF plans at issue in this class action, including Plaintiff's plan, cover

behavioral health services. Rather than administer behavioral health benefits itself, however, BCBSF subcontracted the administration of BCBSF plan behavioral health benefits to a separate entity, Defendant New Directions Behavioral Health Care, LLC ("New Directions"). New Directions is a so-called "managed behavioral health organization." By agreeing to administer BCBSF's behavioral health benefits, New Directions shares BCBSF's fiduciary obligation to make behavioral health coverage determinations solely in the interests of BCBSF plan members and their beneficiaries. These fiduciary obligations in turn require New Directions to develop internal practices that facilitate its behavioral health coverage determinations consistently with generally accepted standards of medical practice.

4.      This case specifically addresses the clinical guidelines New Directions developed to adjudicate behavioral health coverage for BCBSF plan members and their beneficiaries – the so-called "New Directions Medical Necessity Criteria" ("Medical Necessity Criteria" or "New Directions Medical Necessity Criteria"). New Directions makes the Medical Necessity Criteria mandatory such that it systematically applies them in making final and binding coverage determinations for behavioral health claims. New Directions applies its Medical Necessity Criteria across "multiple health plans and benefit structures," including those underwritten by BCBSF.

5.      Plaintiff's daughter, Jane Hering (a pseudonym), is a beneficiary of a BCBSF group health insurance plan sponsored by Plaintiff's employer, The Geneva School of Winter Park, Florida. Jane Hering suffers from, among other conditions, generalized anxiety disorder and anorexia nervosa. Anorexia nervosa is one of the most lethal of all psychiatric conditions, and Jane's situation reveals just how lethal it can be.

6.      Jane, a twenty-year old woman, has suffered from anorexia nervosa since she was a pre-teen. Although she is five feet tall, her weight fluctuates between 60 and 70 pounds, which is far below her ideal body weight of approximately 105 pounds. Jane, whose BCBSF plan covers treatment for eating disorders as part of its mental health benefits, has been trying desperately and without success to have BCBSF cover residential treatment so that she can have a shot at conquering her terrible and potentially fatal disorder. New Directions has applied its

6952824

Medical Necessity Criteria repeatedly to deny Jane coverage for this critical treatment, although her BCBSF plan covers residential treatment and although that treatment is medically necessary as widely understood in the behavioral health community and as defined by the very authorities New Directions cites as support for its Medical Necessity Criteria.

7.      Jane Hering is not the only person affected by New Directions' application of its deficient Medical Necessity Criteria. New Directions systematically applies these same Medical Necessity Criteria to behavioral health claims on a nationwide basis, including with respect to claims submitted by non-BCBSF insureds. But the New Directions Medical Necessity Criteria are not consistent with generally accepted standards of medical practice for the treatment of behavioral health disorders and indeed fall far below those standards, as evidenced by New Directions' own cited medical literature.

8.      Residential treatment, though widely recognized as a critical component in the behavioral health continuum of care for chronic disorders such as Jane's, is quite expensive relative to lower and less effective levels of treatment for these disorders. Moreover, because of the nature of eating disorders, there is a high rate of relapse that requires many sufferers to have repeated admissions to residential facilities in order for them to be able to overcome the disease effectively. This means that the Medical Necessity Criteria, when applied as in Jane's case to deny residential treatment in favor of less expensive treatment, saved Defendants and their business clients a great deal of money at the expense of the medically necessary care the Defendants were obliged by their fiduciary duties to cover. In Jane's case, these were expenses her parents, Plaintiff Susan Hering and her husband, Martin, frequently had to pay out of pocket so they could ensure their daughter received an appropriate level of care. Further, by applying the overly restrictive coverage guidelines to Jane's treatment, Defendants interfered with her ability to obtain the level of care she needed due to the costs facing her family for uncovered medically necessary treatment.

9.      By developing, adopting, and applying the New Directions Medical Necessity Criteria to justify denying medically necessary covered medical treatments to their plan members and beneficiaries, Defendants were not operating "solely in the interests of the

participants and beneficiaries," breached their fiduciary duties to their plan members and beneficiaries, and violated the underlying terms of the BCBSF plans, thereby violating ERISA.

10.     In this action, Plaintiff Susan Hering, who has been designated as her daughter's agent pursuant to a Durable Power of Attorney, seeks to represent, as class representative, similarly situated participants and beneficiaries of plans issued by BCBSF and/or administered by New Directions, whose residential treatment claims for behavioral health disorders were wrongly denied pursuant to the substandard New Directions Medical Necessity Criteria.

## THE PARTIES

11.     Plaintiff Susan Hering and her daughter are each insured by The Geneva School Group Benefit Plan, which is sponsored by The Geneva School where Plaintiff is employed. They are residents of Florida and their health benefit plan is governed by ERISA.

12.     Defendant BCBSF is a corporation organized under Florida law with its principal place of business located in Jacksonville, Florida. BCBSF is responsible for selecting and overseeing co-Defendant New Directions and for adopting and allowing New Directions to apply the defective New Directions Medical Necessity Criteria referenced in this Complaint.

13.     Defendant New Directions is a Missouri corporation organized under Missouri law with its principal place of business located in Kansas City, Missouri. New Directions is responsible for developing and making final and binding coverage determinations pursuant to the defective Medical Necessity Criteria referenced in this Complaint.

## JURISDICTION AND VENUE

14.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331.

15.     Personal jurisdiction exists over BCBSF and New Directions, and this District is the proper venue, because both BCBSF and New Directions conduct significant operations in this District, regularly communicate with insureds who reside in this District, and the Herings reside in this District.

## GENERALLY ACCEPTED STANDARDS OF MEDICAL PRACTICE FOR BEHAVIORAL HEALTH TREATMENT, INCLUDING PATIENT PLACEMENT

16.     Behavioral health disorder treatment standards become "generally accepted" for

4

purposes of assessing medical necessity once they have achieved widespread acceptance among behavioral health professionals. Behavioral health services exist along a continuum of service intensity ranging from the most intensive inpatient psychiatric hospitalization to the least intensive standard outpatient (office-based) services. Residential treatment and partial hospitalization fall within that continuum. This case involves improper denials for residential treatment.

17.     Within the continuum of behavioral health care settings, behavioral health professionals have also widely accepted the clinical standards for assessing where any given patient should be treated. These clinical standards are articulated in multiple recognized sources, including peer-reviewed studies in academic journals, consensus guidelines from professional organizations, and guidelines and materials distributed by government agencies. In fact, the New Directions Medical Necessity Criteria expressly cite many of these sources. Unfortunately for BCBSF plan members and beneficiaries, the Medical Necessity Criteria's citation to these sources is little more than lip service given that the Medical Necessity Criteria generally fall well below the standard of care articulated in the very sources they cite.

18.     The generally accepted standards behavioral healthcare professionals rely on in assessing the appropriate level of care are articulated in the following professional sources: (1) the American Society of Addiction Medicine ("ASAM") Criteria; (2) the American Association of Community Psychiatrist's ("AACP") Level of Care Utilization System; (3) the Child and Adolescent Level of Care Utilization System ("CALOCUS") developed by AACP and the American Academy of Child and Adolescent Psychiatry ("AACAP"), and the Child and Adolescent Service Intensity Instrument, which was developed by AACAP in 2001 as a refinement of CALOCUS; (4) the Medicare benefit policy manual issued by the Centers for Medicare and Medicaid Services; (5) the APA Practice Guidelines for the Treatment of Patients with Substance Use Disorders, Second Edition; (6) the APA Practice Guidelines for the Treatment of Patients with Eating Disorders, Third Edition; (7) the American Psychiatric Association's Practice Guidelines for the Treatment of Patients with Major Depressive Disorder; and (8) AACAP's Principles of Care for Treatment of Children and Adolescents with Mental

5

Illnesses in Residential Treatment Centers.

19.     The generally accepted standards of medical practice for treatment of behavioral health disorders articulated in the clinical sources described above were summarized by the U.S. District Court for the Northern District of California in a post-ERISA trial decision in *Wit v. United Behavioral Health,* 2019 WL 1033730 (N.D.CA Mar. 5, 2019), and are summarized below.

20.     **First,** it is generally accepted that many mental health and substance use disorders are long-term and chronic. For this reason, although a patient may present to a behavioral health professional with certain immediate needs ("acute" or "current symptoms") or, in many cases these current acute symptoms are manifestations of a patient's chronic underlying condition. Behavioral health professionals generally agree that effective treatment of individuals with mental health or substance use disorders requires much more than just the alleviation of their current symptoms. It is also essential to treat the chronic underlying condition – particularly since so many behavioral health disorders manifest in persistent and/or pervasive, severe impairments that are not acute but are nonetheless treatable.

21.     **Second,** it is generally accepted that many mental health and substance abuse disorders involve multiple co-occurring disorders that operate synergistically to aggravate each other. Thus, effectively treating an individual disorder requires a comprehensive, coordinated approach to all of the co-occurring disorders. For example, effective treatment of substance use disorders requires comprehensively treating any co-occurring depressive disorders. This is because the co-occurring depressive disorder can be the underlying cause for the drug use. Or, for example, the depressive disorder can both exacerbate and be exacerbated by the co-occurring drug use. For similar reasons, co-occurring medical conditions can aggravate behavioral health disorders in such a way that effective patient treatment requires a more intensive level of care than might be justified if only the one behavioral health disorder was present. In other words, even where a single mental health disorder might reasonably call for a certain intensity of treatment, it is generally accepted that the presence of co-occurring disorders might trigger the need for a higher intensity of treatment. So, for example, a substance user who

6952824

might be effectively treated as an outpatient, all other things equal, might require residential treatment if, for example, that substance abuser suffers from debilitating social anxiety disorders that make it impossible for that patient to leave home to seek outpatient care.

22.      **Third**, it is generally accepted by the mental health community that the effective treatment of patients with mental health or substance use disorders requires placement at the appropriate level of care. It would be inappropriate, as occurred in this case, to deny residential treatment to an individual like Jane Hering, who suffers from a chronic and potentially fatal eating disorder simply because that patient is not currently suffering from some imminent complication caused by that potentially fatal eating disorder. Behavioral health professionals generally accept that safety and effectiveness are the primary driving factors in determining the appropriate treatment level for any given patient.

23.      **Fourth**, behavioral health professionals generally accept that patients with mental health and substance use disorders must receive treatment at the appropriate level of intensity. Those who receive treatment at a less-than-clinically-appropriate level of care face worse outcomes than those who are treated at the appropriate level of care. In contrast, behavioral health professionals generally agree that erring on the side of providing a higher level of care intensity where there is a question about the appropriate level of care intensity does not result in adverse outcomes. As a result, behavioral health professionals generally accept that ambiguity as to the appropriate level of care dictates erring on the side of placing the patient at the higher level of care.

24.      **Fifth**, behavioral health professionals generally accept that effective treatment must not be limited simply to temporary improvement in the patient's level of functioning. Rather, effective treatment must also aim at preventing relapse or deterioration of the patient's condition and maintaining the patient's level of functioning.

25.      **Sixth**, behavioral health professionals generally accept that effective, behavioral health treatment must not be artificially time limited. Instead, the appropriate duration of treatment for behavioral health disorders must be predicated on the individual needs of the patient. Accordingly, behavioral health professionals generally agree that standards of medical

6952824

practice disfavor patient discharge before treatment has been optimized. Behavioral health professionals also agree that treatment should not be terminated simply because a patient has become unwilling or unable to participate in treatment. Indeed, if a patient demonstrates an unwillingness to participate in treatment, this may actually justify an increased intensity of treatment rather than the termination of it.

26. **Seventh**, behavioral health professionals generally accept the significance of developmental differences between adults on the one hand and children and adolescents on the other. Children and adolescents are not fully "developed," in the psychiatric sense. Level of care intensity decisions require plans to account for the unique needs of children and adolescents suffering from mental health or substance use disorders. This, in turn, requires a relaxation of admissions and continued service requirements when children and adolescents are involved.

27. **Eighth**, behavioral health professionals generally accept that level of care assessments for patients with mental health and/or substance use disorders must not be limited to less than a full multidimensional assessment that accounts for the wide variety of information about the patient, which requires behavioral health providers to conduct a holistic, biopsychosocial assessment that involves consideration of multiple factors. Said differently, it falls below the standard of care to make the level of intensity decision based on only a few enumerated factors rather than the entire patient picture.

### DEFENDANTS' MEDICAL NECESSITY CRITERIA ARE INCONSISTENT WITH GENERALLY ACCEPTED STANDARDS OF MEDICAL PRACTICE AND VIOLATE THE TERMS OF THE BENEFIT PLANS

28. As described above, the plans New Directions administers, such as the BCBSF plan at issue here, must provide benefits for covered services that are "medically necessary," which the BCBSF plan at issue here defines as services that are "widely accepted by the practitioners' peer group as efficacious and reasonably safe based on scientific evidence [and] universally accepted in clinical use such that omission of the service in these circumstances raises questions regarding . . . the appropriateness of the treatment."

29. Likewise, the New Directions Medical Necessity Criteria, which are "intended for

6952824

use with multiple health plans and benefit structures," define medically necessary services as covered services that are consistent with "generally accepted standards of medical practice, as defined by credible scientific evidence published in peer-reviewed medical literature, which are generally recognized by the appropriate medical community, Physician Specialty Society recommendation, and other relevant factors."

30.     The Medical Necessity Criteria claim to justify their restrictions by reference to a voluminous bibliography that cites to peer-reviewed medical literature and Physician Sspecialty

31.     Ssociety recommendations. But then, after having cited the clinical literature, the Medical Necessity Criteria go on to ignore or actively warp it. The New Directions Medical Necessity Criteria are inconsistent with their own primary sources, have omitted references to key publications that are generally accepted as authoritative on the issues they report to deal with, and fall grossly below any generally accepted standards of medical practice applicable to the treatment of behavioral health disorders.

### The Admission Criteria for Residential Treatment Fall
### Below Generally Accepted Standards of Care

32.     The 2019 New Directions Medical Necessity Criteria for admission to residential treatment deny coverage for treatment unless there is a mandatory finding that "there is a reasonable expectation for improvement in the severity of the *current acute* symptoms and behaviors." In other words, New Directions will only cover residential treatment if there are "current acute" symptoms that can be improved, as opposed to chronic conditions for which residential treatment is the most effective means to address the insured's behavioral health needs. This simply is not the standard for covering residential treatment that is generally accepted by behavioral health professionals.

33.     Residential treatment is typically the treatment of choice for behavioral health disorders with persistent and/or pervasive impairments that might not manifest in "current, acute symptoms," but are nonetheless subject to remediation with residential treatment of an appropriate duration. Denials by New Directions of residential treatment in the absence of a

current acute symptom guarantees that patients who could most benefit from residential treatment – those with chronic disorders that do not at that moment present acute symptomatology – will not receive the treatment that behavioral health practitioners generally accept as the most appropriate for treating those disorders.

34.    The admission criteria further improperly restrict coverage for residential treatment by requiring that "the member has documented symptoms and/or behaviors that are a *significant deterioration from baseline* function demonstrated by *recent changes* in behavior(s)/psychiatric symptoms that result in major functional impairment in at least *three* . . . functional areas . . . ." Again, restricting coverage to "significant deterioration from baseline" and "recent changes" presents a significant deviation from the generally accepted standard for covering residential treatment and further reflects a completely inappropriate restriction of residential treatment only to those patients who can demonstrate current acute symptoms rather than covering such care for the chronically severe and/or impairing conditions residential treatment is specifically designed to address.

35.    The problem with this standard is that patients may well have an existing "baseline" for which the generally accepted standard of care is residential treatment. They should not be required to show a "significant deterioration" from that baseline before proper care is provided. The denial of residential treatment for patients simply because their baseline – however bad – has not deteriorated or because there have been no "recent changes" is an absolutely inappropriate reason for denial, and is completely inconsistent with generally accepted standards of medical practice for residential treatment.

36.    The admissions criteria are also inconsistent with generally accepted medical practice because they improperly deny coverage for residential treatment unless a patient can demonstrate functional impairment in at least three functional areas articulated in the Medical Necessity Criteria. This falls short of generally accepted practice because significant impairments in even one functional area (such as work or school) may be sufficient to warrant residential treatment, and there is no clinical basis to *require* functional impairment in three such areas before coverage is provided.

10

37.     The admission criteria are further inconsistent with generally accepted standards of medical practice because they limit residential treatment to "clinically significant symptom reduction" rather than covering residential treatment in cases where that treatment could meaningfully improve a patient's functional impairments, prevent deterioration of those extant impairments, and/or enhance the patient's coping skills.

38.     Another mandatory requirement is that the treatment not be "custodial" in nature. While generally accepted standards of medical practice and the BCBS plans define "custodial care" as "personal care that does not require the continuing attention of trained medical or paramedical personnel," the Medical Necessity Criteria warp this term to mean "care that does not require access to the full spectrum of services performed by licensed health care professionals that is available 24 hours a day in facility-based settings to avoid *imminent*, serious, medical or psychiatric consequences . . . ." According to New Directions' self-serving and Plan-offending definition, therefore, skilled clinical services are deemed custodial if they are not intended to avoid "*imminent*, serious, medical or psychiatric consequences," resulting in non-coverage of skilled services that, among other things, promote recovery from or maintain stabilization of chronic conditions that progressively (but not imminently) result in serious, medical or psychiatric consequences. This goes far beyond the generally accepted definition of custodial care, which is care solely to provide non-medical personal care, such as assistance with eating, dressing, personal needs and the like.

39.     In addition, the admission criteria for residential treatment fall below generally accepted standards for covering residential treatment because they deny residential treatment coverage for  members with recent residential treatment histories unless those patients can "document[] . . . the ability to participate in and benefit from the treatment at a residential/subacute level of care." But New Directions' limitation of residential treatment to the stabilization of current acute symptoms and non-coverage once those current acute symptoms are stabilized does nothing to address the underlying disorders that qualified mental health professionals agree must be resolved before discharge. In other words, the Medical Necessity Criteria not only set the patients up for failure by failing to cover treatment before underlying

11

disorders are sufficiently resolved, but they guarantee that patients will be unable to document the ability to benefit from residential treatment once relapse occurs due to premature discharge occasioned by New Directions' lack of coverage. The residential treatment admissions standards as articulated in the Medical Necessity Criteria, in other words, build in the seeds for future denials by making patients unable to demonstrate the ability to benefit from treatment.

40.     It is further generally accepted among behavioral health professionals that so-called "fail-first" criteria, whereby patients must fail at a lower intensity of treatment before a higher level of treatment will be covered, do not meet generally accepted standards of behavioral health care. The introduction to the Medical Necessity Criteria concedes as much where they purport not to apply any such "fail-first" requirements. In fact, fail-first policies are not just inconsistent with generally accepted standards of medical practice, but they also violate applicable federal and state mental health parity laws that preclude more restrictive coverage policies for behavioral health services than for medical treatment.

41.     Notwithstanding New Directions' express rejection of any "fail-first" protocols, however, the Medical Necessity Criteria for residential admission fall below the generally accepted standard of care and directly contradict their own introductory disavowal of them because the Medical Necessity Criteria either explicitly or implicitly impose fail-first requirements before New Directions will cover the most appropriate level of care.

42.     New Directions' implementation of this de facto fail-first policy is embodied in its admission criteria for residential treatment of psychiatric disorders, which require members to prove previous treatments failed before covering a higher level of care. In this regard, the Medical Necessity Criteria, contrary to their disavowal of fail-first policies, require a patient seeking a higher level of care intensity to provide a "[d]ocumented history of an inability to be managed at an intensive lower level of care" after a recent therapeutic trial. In order for such "documented history" to be provided, the insured must have received and failed at the lower level of care.

43.     With respect to eating disorders, the Medical Necessity Criteria for admission to residential care also require satisfaction of one of three additional criteria – all of which are, at

6952824

least in part, inconsistent with generally accepted standards of medical practice. For example, the Medical Necessity Criteria deny coverage unless patients meet certain biomedical thresholds (e.g., pulse, blood pressure, serum glucose, potassium, temperature). But these thresholds are consistent with admission factors for hospitalization – not residential treatment. In other words, even if the various biomedical thresholds are not met, the insured may well require residential treatment according to generally accepted standards of care, a fact that is not recognized under New Directions' Medical Necessity Criteria.

### The Residential Treatment Continued Stay Criteria are also Deficient

44.    The pervasive defects in the Medical Necessity Criteria are not limited to the admission criteria, but extend as well to the Medical Necessity Criteria's "continued stay" requirements applied to justify continued residential treatment following an initial authorization of such treatment. These continued stay requirements fail to satisfy generally accepted standards of medical practice because, as with the admissions criteria, the continued stay criteria require members to demonstrate "a reasonable expectation for improvement in the severity of the *current acute* symptoms and behaviors" and that care is "necessary to treat the intensity, frequency and duration of *current* behaviors and symptoms." In other words, for the same reasons described earlier, these requirements improperly focus on alleviation of current acute symptoms rather than focusing on ensuring a patient's recovery from underlying, chronic conditions.

45.    As with the admissions criteria, the continued stay criteria for residential treatment fall below the generally accepted standards of medical practice because they require patients' treatment plans to be "focused on the alleviation of [primary] disorder symptoms and precipitating psychosocial stressors," rather than being focused on alleviating the underlying conditions and comorbidities for which generally accepted standards of care recognize should be addressed in residential treatment.

46.    Additionally, the continued stay criteria fall below the generally accepted standard of care because they deny coverage for members with recent residential treatment histories unless they can  "document[] . . . the ability to participate in and benefit from the

13

treatment at a residential/subacute level of care." As already described above, this is a self-denying coverage criterion that cannot possibly be met. Patients whose behavioral health disorders result in persistent and/or pervasive impairments are properly treated at the residential level of care, irrespective of whether the treatment is sought after a relapse from a previous course of residential treatment.

47.     The continued stay criteria further preclude coverage for residential treatment where care is "custodial," but as described above, the Medical Necessity Criteria define this term inconsistently with generally accepted standards of medical practice and with the express terms of the BCBS plans. In particular, rather than defining "custodial care" appropriately to apply to personal care services that do not require trained medical personnel, New Directions improperly defines "custodial" care as that which does not require 24-hour availability of licensed health care professionals to avoid "imminent" and "serious" consequences. Thus, the New Directions definition is far more restrictive than is generally accepted so as to inappropriately place many medically necessary services within the custodial exclusion.

48.     While generally accepted standards of medical practice for behavioral health disorders do not impose artificial time limits on treatment, the continued stay criteria also deny residential treatment coverage without "documentation of member progress towards objective, measurable, and *time limited treatment goals* that must be met for the member to transition to the next appropriate level of care." Requiring such "time limited" goals is arbitrary and not patient-centered since individuals progress at different rates and not according to cookie-cutter templates.

49.     Moreover, generally accepted standards of medical practice recognize that patients who are not motivated for treatment often require even higher/more intensive levels of care than might normally be called for. Contrary to these generally accepted standards of medical practice, the Medical Necessity Criteria deny coverage for continued stay without a demonstration of "increasing motivation" and they nowhere provide for transition of patients to more intensive care levels to enhance motivation.

**Defendants Applied the Defective Medical Necessity**
**Criteria to Wrongfully Deny Covered Benefits**

6952824

50.     Defendants' wrongful coverage denials based on their defective Medical Necessity Criteria are illustrated by Jane Hering's experiences with their claims administration.

51.     On December 17, 2018, Jane was hospitalized at Center for Change, an in-network provider with BCBSF. Only nineteen years old at the time and five feet tall, Jane weighed just 68.2 pounds (65% of her ideal body weight), her Body Mass Index ("BMI") was only 13.3% (whereas 18.5% represents a low-normal BMI), and her bones were clearly visible.

52.     Barely three days after Jane's hospital admission, New Directions denied further coverage. Applying the Medical Necessity Criteria, New Directions' physician reviewer, Barbara Center, determined that Jane's hospitalization was "custodial," that her condition was "unlikely to improve," and that standard "psychiatric outpatient" treatment, the lowest level of care other than none at all, was sufficient, thereby bypassing residential treatment entirely, even though that is the next lower level of care from hospitalization.

53.     This is a stunning betrayal of fiduciary duty and medical ethics by a physician who determined that, because the patient was "unlikely to improve" based on defective Medical Necessity Criteria, Jane became a throw-away who should receive the lowest level of treatment on the clinical spectrum rather than the most effective service to help her recover. Moreover, because the criteria for "psychiatric" outpatient treatment are different than that for an eating disorder, New Directions' analysis was fatally flawed in any event. Jane would not have met the criteria for psychiatric treatment that New Directions was suggesting. On December 21, 2018, New Directions upheld its denial based on the same Medical Necessity Criteria.

54.     Unwilling to accept New Directions' outpatient death sentence, Jane remained hospitalized through December 25, 2018, at which point she was transferred to residential treatment. At the time, Jane weighed 72.8 pounds (69% of her ideal body weight) and her BMI was 14.2%.

55.     By letter dated December 27, 2018, New Directions denied Jane's residential transfer and asserted that, based on its Medical Necessity Criteria for eating disorders, Jane's treatment was "custodial," that her condition was "unlikely to improve," and that standard

6952824

outpatient treatment was sufficient.

56.     Following an urgent appeal, New Directions reversed its denial on December 28, 2018, but failed to inform Jane that Barbara Center, the same physician reviewer who denied Jane's inpatient coverage on December 20, 2018, indicated in her December 28, 2018 case notes that Jane actually required hospitalization due to her "very low body weight." Instead, New Directions self-servingly opted to cover the less expensive residential treatment rather than admit that Jane's hospitalization was warranted all along.

57.     As of January 7, 2019, however, the same New Directions' physician reviewer, Barbara Center, denied further residential coverage. Applying the Medical Necessity Criteria, Dr. Center concluded that Jane would not improve. Soon thereafter, New Directions' physician reviewer, Diana Antonacci, denied Jane's urgent appeal. Applying the same Medical Necessity Criteria, Dr. Antonacci asserted that because Jane was not suicidal, homicidal, psychotic, suffering from acute medical issues, and had gained 2 pounds, she had "received maximum therapeutic benefit from residential treatment" and that outpatient treatment would suffice.

58.     While these perverse rationales were entirely consistent with the acuity-driven Medical Necessity Criteria, they were utterly inconsistent with generally accepted standards of medical practice. In fact, the very American Psychiatric Association Practice Guideline for the Treatment of Eating Disorders, Third Edition, cited in the Medical Necessity Criteria bibliography, expressly states that:

> Among patients with a *chronic* course of anorexia nervosa, many are unable to maintain a healthy weight and experience chronic depression, obsessionality, and social withdrawal. Treatment may require consultation with other specialists; *repeated* hospitalizations, partial hospitalizations, or *residential care . . . There is no available evidence to show that brief stays for anorexia nervosa are associated with good long-term outcomes*. Several studies have reported that hospitalized patients who are discharged at a weight lower than their target weight subsequently relapse and are rehospitalized at higher rates than those who achieve their target weight before discharge.

59.     On or about January 11, 2019, Jane discharged from Center for Change. Predictably, she soon began to deteriorate and was again hospitalized on March 12, 2019 with a body weight of 63.6 pounds. Despite acknowledging her "very low weight," New Directions

6952824

asserted that, pursuant to its Medical Necessity Criteria, Jane's care was "custodial." Jane remained hospitalized until April 12, 2019, at which point she was transferred to residential treatment with a body weight of 73.8 pounds. Although Jane was still significantly underweight, she was improving and her treating physicians hoped she could consolidate her weight gains and internalize the eating habits she had begun to learn while hospitalized.

60.     Once again, applying the Medical Necessity Criteria, New Directions' physician reviewer, Barbara Center, denied Jane's residential admission because she was not suicidal, homicidal, psychotic, or acutely medically unstable. On April 19, 2019, applying the same Medical Necessity Criteria, New Directions physician reviewer, Diana Antonacci, upheld the coverage denial.

61.     As illustrated above, Jane's residential treatment claims were denied based on acuity-driven, treatment-undermining criteria that are inconsistent with generally accepted standards of medical practice. The Medical Necessity Criteria unjustifiably restrict crucial access to behavioral health treatment for patients with chronic disorders for whom intensive services, to be meaningful, must not be doled out so parsimoniously as to essentially constitute a denial of treatment.

62.     Defendants permitted their Medical Necessity Criteria to be applied for their own self-interest rather than solely for the interests of their beneficiaries and thus violated the benefit plans that they administer as ERISA fiduciaries.

### Defendants' Medical Necessity Criteria Development and Adoption Processes Are Improperly Infected By Financial Considerations

63.     Both Defendants earn money by charging fees for their insurance services, including behavioral health claims administration. For fully-insured plans, BCBSF bears the risk that reimbursements will exceed their fixed premiums and/or any per-member-per-month rates that it allocates for behavioral health expenditures. For self-funded plans, BCBSF is paid an administrative fee and the employer, as the plan sponsor, pays the medical expenses approved by Defendants. In both situations, BCBSF pays an administrative fee to New Directions to administer behavioral health claims and does so based on assurances that New Directions will

17

keep costs under control. Both Defendants therefore have an incentive to reduce medical expenses in order to retain business and sell their services as cost-effective claims administrators, and consequently have financial incentives to artificially suppress behavioral health costs.

64.     These financial incentives have infected the New Directions Medical Necessity Criteria development process, since the Medical Necessity Criteria are the primary clinical tool with which Defendants ration access to behavioral healthcare.

### Defendants Violated ERISA

65.     In light of their central role in adjudicating claims for behavioral health treatment, and in developing and adopting clinical coverage guidelines, Defendants are ERISA fiduciaries as defined by 29 U.S.C. Section 1104(a). As such, Defendants are legally required to discharge their duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries and paying reasonable expenses of administering their plans. They each must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans it administers, so long as such terms are consistent with ERISA. As fiduciaries, Defendants owe a duty of loyalty to plan participants and beneficiaries. They must also refrain from any conduct that violates state or federal law.

66.     As set forth above, Defendants suffer from an inherent conflict of interest in their role as insurers and claims administrators. Consequently, they have every incentive to develop and adopt the defective New Directions Medical Necessity Criteria. Against this backdrop, Defendants have violated their fiduciary duties, as detailed herein.

### CLASS ACTION ALLEGATIONS

67.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

68.     Defendants cover residential treatment when, as an essential condition, services are consistent with generally accepted standards of medical practice. The policies and practices

6952824

that Defendants followed with respect to the claims filed by Plaintiff Hering are the same as those that have been applied by Defendants to other similarly situated insureds seeking behavioral health treatment coverage under their health plans.

69.     As such, pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings her claims on behalf of two putative classes of similarly situated individuals as noted in the counts below. The first class (the "BCBSF Class") is defined as follows:

> Any member of a health benefit plan issued and/or administered by BCBSF and governed by ERISA whose request for coverage of residential treatment for behavioral health disorders was denied initially or on appeal by New Directions, in whole or in part, within the applicable statute of limitations based on the New Directions Medical Necessity Criteria for Residential Treatment of psychiatric or eating disorders. The members of the Class can be objectively ascertained through the use of information contained in Defendants' files because Defendants know who their insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

Defendants in the BCBSF Class include both BCBSF and New Directions.

70.     The second class (the "New Directions Class") is defined as follows:

> Any member of a health benefit plan governed by ERISA whose request for coverage of residential treatment for behavioral health disorders was denied initially or on appeal by New Directions, in whole or in part, within the applicable statute of limitations based on the New Directions Medical Necessity Criteria for Residential Treatment of psychiatric or eating disorders. The members of the Class can be objectively ascertained through the use of information contained in Defendants' files because Defendants know who their insureds are, which plans they are insured by, what type of claims they have filed, and how those claims were adjudicated.

Defendants in the New Directions Class includes only New Directions and involves all ERISA plans that are administered by New Directions other than those issued by BCBSF.

71.     Upon information and belief, there are so many persons within the putative class that joinder is impracticable. While Plaintiff does not have access to the identity of the putative class members, such information is within the possession and control of Defendants.

72.     Certification of the Classes is desirable and proper because there are questions of law and fact in this case that are common to all members of each of the classes. Plaintiff alleges that Defendants breached their fiduciary duty and abused their discretion by developing and

6952824

applying coverage guidelines that were more restrictive than the generally accepted standards all class members' insurance plans required Defendants to follow. The resolution of these claims will turn on several common legal and factual questions, including whether Defendants were acting as an ERISA fiduciary when they developed and/or acquired the New Directions Medical Necessity Criteria and adopted a policy of applying them to all coverage determinations, whether the Medical Necessity Criteria are consistent with generally accepted standards of care, whether Defendants breached their fiduciary duty by using the Medical Necessity Criteria to adjudicate claims for coverage, and what remedies are available to the classes. These are comparable to the common questions identified in Judge Spero's September 19, 2016 Order Granting Motion for Class Certification in *Wit*, Case No. 14-cv-02346 JCS, ECF No. 133 and *Alexander*, Case No. 14-cv-05337 JCS, ECF No. 97. *See Wit v. United Behavioral Health*, 317 F.R.D. 106 (N.D. Cal. Sept. 19, 2016).

73.      Certification is desirable and proper because the Plaintiff's claims are typical of the claims of the members of the classes Plaintiff seeks to represent.

74.      Certification is also desirable and proper because the Plaintiff will fairly and adequately protect the interests of the classes she seeks to represent. There are no conflicts between the interests of the Plaintiff and those of other members of the classes, and the Plaintiff is cognizant of her duties and responsibilities to each of the entire classes. Plaintiff's attorneys are qualified, experienced and able to conduct the proposed class action litigation, as reflected in the *Wit* litigation, which the undersigned counsel litigated.

75.      It is desirable to concentrate the litigation of these claims in this forum. The determination of the claims of all class members in a single forum, and in a single proceeding would be a fair and efficient means of resolving the issues in this litigation.

76.      The difficulties likely to be encountered in the management of a class action in this litigation are reasonably manageable, especially when weighed against the virtual impossibility of affording adequate relief to the members of the classes through numerous separate actions.

77.      On behalf of the Classes defined above, Plaintiff asserts the following claims. For

6952824

the BCBSF Class, the Claims are asserted against both Defendant BCBSF and New Directions; for the New Directions Class, the Claims are only applicable to New Directions and not BCBSF.

## COUNT I

### CLAIM FOR BREACH OF FIDUCIARY DUTIES
### BROUGHT ON BEHALF OF PLAINTIFF AND THE CLASSES

78.     Plaintiff incorporates by reference the preceding paragraphs as though such paragraphs were fully stated herein.

79.     This count is brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

80.     As the entities ultimately responsible for making behavioral health coverage determinations under Plaintiff's Plan, and responsible for developing internal practices and policies to facilitate such determinations, Defendants are ERISA fiduciaries.

81.     As ERISA fiduciaries, and pursuant to 29 U.S.C. §1104(a), Defendants are required to discharge their duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries and paying reasonable expenses of administering the plan. They must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plans they administer. They must conform their conduct to a fiduciary duty of loyalty.

82.     Defendants violated these duties by developing and adopting the restrictive New Directions Medical Necessity Criteria for Residential Treatment discussed herein. Despite the fact that the health insurance plans that insure Plaintiff and the Class provide for insurance coverage for residential treatment consistent with generally accepted standards of medical practice, the fact that generally accepted standards of medical practice are well-known to Defendants, and that fact that Defendants asserted that the New Directions Medical Necessity Criteria were consistent with generally accepted standards of medical practice, Defendants in fact developed and adopted clinical coverage guidelines that are far more restrictive than those that are generally accepted. In doing so, Defendants did not act "solely in the interests of the participants and beneficiaries" for the "exclusive purpose" of "providing benefits." They did not utilize the "care, skill, prudence, and diligence" of a "prudent man" acting in a similar capacity.

6952824

They did not act in accordance with the terms of Plaintiff's Plan.

83.    Instead, Defendants elevated their own interests above the interests of plan participants and beneficiaries. By adopting improperly restrictive guidelines, Defendants artificially decreased the number and value of covered claims thereby benefiting themselves and corporate affiliates at the expense of their insureds.

84.    Plaintiff and the members of the Class have been harmed by Defendants' breaches of fiduciary duty because claims for benefits were subjected to Defendants' restrictive clinical coverage guidelines, making it less likely that Defendants would determine that their claims were covered.

85.    Plaintiff and the members of the Class seek the relief identified below to remedy this claim.

## COUNT II

### CLAIM FOR IMPROPER DENIAL OF BENEFITS
### BROUGHT ON BEHALF OF PLAINTIFF AND THE CLASS

86.    Plaintiff incorporates by reference the preceding paragraphs one through seventy-six as though such paragraphs were fully stated herein.

87.    This count is brought pursuant to 29 U.S.C. §1132(a)(1)(B).

88.    Defendants denied the insurance claims for residential treatment submitted by Plaintiff and other members of the Class in violation of the terms of Plaintiff's plan and the insurance plans that insure members of the Class. Defendants denied these claims, in part, based on restrictive clinical coverage guidelines they developed and adopted in violation of their fiduciary duties. They also denied these claims, in part, based on its systematic practice of applying clinical coverage guidelines that are more restrictive than generally accepted standards of care, as set forth above.

89.    Plaintiff and the members of the Class have been harmed by Defendants' improper benefit denials because Defendants denied their claims for benefits using clinical coverage criteria that were inconsistent with the applicable plan terms.

90.    Plaintiff and the members of the Class seek the relief identified below to remedy

6952824

this claim.

## COUNT III

### CLAIM FOR EQUITABLE RELIEF
### BROUGHT ON BEHALF OF PLAINTIFF AND THE CLASS

91.     Plaintiff incorporates by reference the preceding paragraphs one through seventy-six as though such paragraphs were fully stated herein.

92.     This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(A) only to the extent that the Court finds that the injunctive relief sought to remedy Counts I and/or II are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

93.     Plaintiff and the Class have been harmed, and are likely to be harmed in the future, by Defendants' breaches of fiduciary duty described above.

94.     In order to remedy these harms, Plaintiff and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

## COUNT IV

### CLAIM FOR OTHER APPROPRIATE EQUITABLE RELIEF
### BROUGHT ON BEHALF OF PLAINTIFF AND THE CLASS

95.     Plaintiff incorporates by reference the preceding paragraphs one through seventy-six as though such paragraphs were fully stated herein.

96.     This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B) only to the extent the Court finds that the equitable relief sought to remedy Counts I and II are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

97.     Plaintiff and the Class have been harmed, and are likely to be harmed in the future, by Defendants' breaches of fiduciary duty described above.

98.     In order to remedy these harms, Plaintiff and the Class are entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

### REQUESTED RELIEF

WHEREFORE, Plaintiff demands judgment in their favor against Defendant as follows:

A.     Certifying the Classes and their claims, as set forth in this Complaint, for class treatment;

6952824

B.     Appointing the Plaintiff as Class Representatives for the Classes;

C.     Designating Zuckerman Spaeder LLP and Psych-Appeal, Inc., as counsel for the Classes;

D.     Declaring that the New Directions Medical Necessity Criteria adopted and applied in violation of Defendants' fiduciary duties;

E.     Issuing a permanent injunction ordering Defendants to stop utilizing the guidelines complained of herein, and instead adopt or develop clinical coverage guidelines that are consistent with generally accepted standards of medical practice;

F.     Declaring that Defendants' denials of residential treatment coverage based on the New Directions Medical Necessity Criteria were improper;

G.     Ordering Defendants to reprocess claims for residential treatment that they previously denied (in whole or in part) pursuant to new clinical coverage guidelines that are consistent with generally accepted standards of medical practice;

H.     Ordering Defendants to faithfully apply their guidelines (including any new guidelines they may adopt in response to the relief sought herein) in reprocessing claims for residential treatment that it previously denied (in whole or in part), and in processing future claims for residential treatment;

I.     Awarding Plaintiff's disbursements and expenses for this action, including reasonable counsel and expert fees, in amounts to be determined by the Court, pursuant to 29 U.S.C. § 1132(g); and

J.     Granting such other and further relief as is just and proper, including but not limited to awarding a surcharge disgorging Defendants' unjust gain from its wrongful conduct and removal of New Directions as a fiduciary as a result of its pattern of conduct in violation of its fiduciary duties under ERISA.

Dated:   September 5, 2019

Respectfully submitted,


/s/ Jack Fernandez
ZUCKERMAN SPAEDER LLP
Jack Fernandez

24

6952824

Florida Bar No.: 843751
101 East Kennedy Boulevard, Suite 1200
Tampa, Florida 33602
Tel: (813) 221-1010
jfernandez@zuckerman.com

ZUCKERMAN SPAEDER LLP
Justin R. Cochran
Florida Bar No. 110342
101 East Kennedy Boulevard, Suite 1200
Tampa, Florida 33602
Tel: (813) 221-1010
jcochran@zuckerman.com

ZUCKERMAN SPAEDER LLP
Caroline E. Reynolds (subject to *pro hac vice*
admission)
1800 M St., NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
creynolds@zuckerman.com

ZUCKERMAN SPAEDER LLP
D. Brian Hufford (subject to *pro hac vice* admission)
Jason S. Cowart (subject to *pro hac vice* admission)
485 Madison Avenue
New York, NY 10022
Tel: (212) 704-9600
Fax: (917) 261-5864
dbhufford@zuckerman.com
jcowart@zuckerman.com

ZUCKERMAN SPAEDER LLP
Adam B. Abelson (subject to *pro hac vice* admission)
100 East Pratt St., Suite 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
aabelson@zuckerman.com

PSYCH-APPEAL, INC.
Meiram Bendat (subject to *pro hac vice* admission)
8560 West Sunset Boulevard, Suite 500
West Hollywood, CA 90069
Tel: (310) 598-3690, x.101
Fax: (310) 564-0040
mbendat@psych-appeal.com

LIGGIO LAW, P.A.

25

6952824

Jeffrey M. Liggio
1615 Forum Place, Suite 3B
West Palm Beach, FL 33401
Tel: (561) 616-3333
Fax: (561) 616-3266
jliggio@liggiolaw.com

LIGGIO LAW, P.A.
L. Jason Cornell
1615 Forum Place, Suite 3B
West Palm Beach, FL 33401
Tel: (561) 616-3333
Fax: (561) 616-3266
jcornell@liggiolaw.com

*Attorneys for Plaintiff*

6952824